## Case No. 5,233.

## GARDNER et al. v. The NEW JERSEY.

[1 Pet. Adm. 223.]

District Court, D. Pennsylvania. 1806.

BY THE COURT. When I first came into this court, I made, in several instances, distribution of surplus monies, under the idea, that I had the power so to do, agreeably to the doctrine now stated. to justify me in granting the prayers of the petitions. But on experience, I found myself involved in many difficulties and mistakes, in the application of this doctrine. It was one among the mass of irregularities I had to encounter, before I established, by frequent decisions, and with much consideration, the general principles which now prevail. I found it best and safest, to fix some general rules, applicable to most cases, though at times, some anomalous instances should occur, inducing particular hardships. The rule. by which I have governed myself for several years past, is, that it shall appear, that a sum claimed out of the surplus or remnant, is either of itself. or in its origin. a lien on the ship, or other thing out of which the monies were produced. This rule is not only justified by the practice of the civil law, but in the English chancery, and even in their courts of common law, wherein they are governed, when the case requires, by the principles of other courts, having concurrent cognizance of the subject matter, either incidental, or in chief. Many authorities may be produced to support this position. In chancery, the monies arising from sales of lands, are distributed as liable to the same trusts or liens, to which the land itself was subjected; and so of the produce of any subject or thing. originating the suit, or matter, under the cognizance or the enquiry of the court. Whensoever the courts of common law have occasion to determine questions of admiralty jurisdiction or cognizance, the principles of decisions in the admiralty courts are pursued. Their strict adherence to preferences, given by liens at common law,

is invariable. But it is rare indeed, if at all to be discovered, that liens on monies or other subjects, are attached by considerations not originally subsisting, or exclusively fixed.

With respect to the claim of the master, for sums paid abroad to mariners, or even here, I think, on principle, these, as well as monies advanced in foreign ports for necessaries, supplied to the ship on her voyage, (however it may be at the port of outfit, or where the owners reside) are liens, and the ship was hypothecated therefor. Claims of material men, for supplies afforded to a ship, are within the jurisdiction of the admiralty, and suable there, in England, as well as in other states. Pilotage is a necessary expenditure on a voyage. If a master pays demands for these claims, he represents the claimants, and the lien continues on the monies produced by the sale of the ship.[2] As to pilotage, the master is bound by the laws of Oleron, and other maritime laws, to pay it, for the safety of the ship and goods. In England a shipwright may sue in the admiralty, for building a ship for navigation on the sea (Rolle, Abr. 534), and for repairing a ship. Cro. Car. 296; cited in 2 Bac. Abr. (5th Ed.) 180. But as the laws of this state provide for shipwrights and material men at the port of outfit, and also regulate domestic pilotage, and the sums due and recoverable here, on that account I have generally referred parties exhibiting such claims, to the state jurisdictions; wishing to avoid all collisions and conflicts in such cases. I have confined this to domestic supplies and pilotage. Those furnished, or paid, in foreign ports, or here, on ships on their voyage, and not at a port of outfit, the owners being resident here, I have reimbursed, or distributed, out of surplus monies, where liens or hypothecations have appeared to me to have attached. I have also directed a surplus to be paid over to a master, where the owner or his authorized attorney or agent, did not appear. But this has been done with great caution. Wharfage has been allowed out of proceeds, as the wharfinger might detain the ship until payment.

I do not find any precedent or authority to warrant my granting the prayer of the master's petition, in the case before me, for his wages. His contract is clearly personal, and made with and on the credit of the owners resident here, and not on that of the ship. He is the owner's agent, and responsible to him for his acts, particularly those relating to mariners' contracts, and other transactions in the affairs of the ship. If in any thing he has done wrong, the owners may retain; and the contest is cognizable in another jurisdiction. If he is also answerable to those furnishing supplies by his order, and to the officers and mariners of the ship, he is indemnified by such claims being attached as liens on the ship, or the monies produced on sale, in addition to the owner's responsibility. He has a farther security in the right to collect the freight, and possess the fund out of which wages are payable. So that the law clearly distinguishes his case, as it respects wages, from those usually entitled to liens. I have paid out of surplus, the wages due to masters of Spanish ships, because the laws of Spain entitle them thereto: and I always am regulated, in the affairs of foreign ships, by the laws of the country to which they belong. I could discover no precedent for this in the laws of any other country.

The maritime laws of England,[3] existing before our Revolution, and consistent with our situation, are yet our laws. It is but recently that admiralty cases have been published. We have, therefore, unavoidably, recourse to their common law books, for authorities. These invariably shew, that the master "cannot sue in the admiralty court, for his contract is on the credit of the owners, and not, like that of the mariners, on the credit of the ship." 2 Rob. Adm. Cas. 196. These authorities, as well as the few maritime cases published, also point out what parties may sue in admiralty courts. See 2 Bac. Abr. (5th Ed.) 181, and authorities cited.

---

[2] Although, in strictness, it might be contended that the lien was discharged, by payment to those who only held it until satisfaction was made; I have thought myself authorized to give more latitude, from equitable considerations, in such cases, than the inflexibility of rigid legal rules would, perhaps, in general permit. These rules I venerate too much to take unwarrantable liberties with them. The allowance to the master in this case, was not opposed. He had the power to hypothecate the ship for necessaries, in a foreign port; and was under no obligation to advance his own money. Wherever these advances are made, every security for repayment should be encouraged.

[3] The maritime laws, when clearly adopted and settled, became part of the English common law, which is retained by us to this day, in all cases permitted by the principles of our government. In a former note on this subject,—Thompson v. The Catharina [Case No. 13,949].—I have either expressed myself improperly, or there was some mistake in copying. The words (after "the feudal parts of this law") "and such as are," should be struck out, so that it read, "the feudal parts of this law inconsistent with the principles," &c. So it may be said of any other parts of the common law, if such there be. But I do not mean to enter into any controversy, as to what parts, or in what cases, the common law is obligatory and directory in the courts of the United States, having on these subjects often declared my opinion. Whatever difference of sentiment there may exist, as to its being granted by the people—delegated to the federal courts—or it being required that so it should be—it must be indisputably known, to all who are well informed, that without the rules and provisions as settled and made by the common law, the courts would be inoperative. The parties having the privilege of suing therein, or those compelled to become suitors there, would find themselves in a destitute and hopeless condition. Proceedings must be new-modelled, and remedies defined and made efficient. Even crimes (as to the jurisdiction over which there is the most discontent and controversy) could not be

As to the reasonings and opinions of an elementary writer, (2 Browne, Civ. & Adm. Law, 95), whatever weight may be attached to them, as theories to shew what the law ought to be, I think it safest to be guided by what it is. I have had occasion to discuss, in several cases, the subjects of maritime jurisdiction. It will be found that I have endeavoured to establish it on similar principles, where from necessity I was compelled to reason, without a precedent to direct me. It is certainly founded, for the most part, on the subject matter, and not solely on the place of making the contract. But I do not wish to wander into theories, where respectable precedents can be found. All these are opposed to this writer's doctrine.

The authority of Sir William Scott, whose opinions I highly respect, where no diplomatic direction gives a bias to the judgment, is more to be depended upon. He seems to hold, that surplus and remnants have been distributed to the master; or rather, that "upon enquiry, no instance has been found, in which a master has been permitted to sue against proceeds in the registry, except in cases of mere remnants and surplus; and not even then, if there have been any adverse interests opposing it." I have a similar wish to that expressed by Sir W. Scott, to aid an unfortunate suitor. In that case, the bottomry creditor alone, appeared as adverse; and his lien reached the remnants and surplus.—So that Sir W. Scott was not under the necessity of explaining what he meant by "adverse interests," or whether he distinguished them, by such as were accompanied by liens, or general interests, without such preference. In the case under consideration, I am given to understand, that there are creditors of insolvent part owners, whose interests are adverse to the master's claim; and who certainly deem themselves equally entitled to payment; beside, if the master can obtain his object in this mode. it will establish a precedent for such applications in all future cases, wherein monies arising from sales of ships for wages, or other causes, are ordered into court. Thus a lien will be created; and, though not originally attaching directly, will be fixed by circuitous and indirect means. I shall continue to adhere to the principles I have endeavoured to establish, not to admit the distribution or payment of surplus, to others than those who originally had liens, or legal appropriations, on the object from which the monies in court were raised.

From what has been stated it appears, that there is no foundation for the claim of the physician. It is true that a court having possession of the principal, has power over its incidents. But these incidents must rise out of the principal, or be in connexion with it, or flow consequentially from it. Thus, if the original cause arises at sea, and matters happen on land dependent upon it, the admiralty has still jurisdiction. So of goods taken piratically, or as prize, at sea, and brought to land—sails, or other apparel or furniture, taken from a ship under cognizance of the admiralty, and brought to land. So of all questions consequential to that of prize, &c. See authorities cited, 2 Bac. Abr. 178–180. Thus if claims, or liens, are legally attached to things, or monies under the cognizance, or within the jurisdiction of the admiralty, this court has power to decide respecting them. But it does not follow, that claims independent of such things, or monies produced from them, and mere personal demands on their owners, are within the reason of, or entitled to the remedy, prescribed by this principle; and I deem it an exclusion from a distribution, or a claim to a surplus, unless a lien or appropriation is precedently and legally fixed, that those who claim such distribution, could not sue in the admiralty for their demands. There is no doubt that the physician has no capacity, as such, to bring a suit in the admiralty court for his demand, which is merely personal, on the owner, or owners of the ship. The amount of the master's claim for $257, as stated in his petition, for monies expended during the voyage, for the purchase of necessaries required in the service of the ship, and wages paid to mariners, is directed to be paid. The claim for his wages is disallowed; and the prayer of the petition of Dr. Baldwin cannot legally be granted.

I have gone so much at large into this subject, that the principles established in its discussion, may regulate future claims to monies brought into court, under similar circumstances.

---

described, prosecuted or punished, according to any other law now extant. Some of the highest, and most of the inferior crimes and offences, are undefined by any law of the United States. For what depends then on any other provision. they may be committed with impunity, if common law designations and definitions. and the forms of process. and modes of proceeding are rejected. We have experience sufficient to convince us of the inefficiency. and often mischief, apparent in attempts to substitute alterations. or supposed amendments, for the rules and principles of the common law. It would be more than human, if it were entirely perfect. If experience and change of circumstances suggest alterations, they are but few. In attempting reform in these, if we shake the whole fabric, it were better to suffer it to remain undisturbed. In another note on the same case—Thompson v. The Catharina [supra],—I have been also careless or unfortunate, in expressing myself, on another part of the subject. The two last sentences of the last paragraph of the first note should read thus—"an agreement not to bring a suit to enforce performance of a contract, if made for a time limited, is well; but if made posterior to the bond. contract, or agreement, indefinitely, it amounts to a general release." See Carth. 64; Comb. 123, 4.